1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  RAYMOND BROWN,                           1:11-cv-01013-AWI-DLB (HC)

10                    Petitioner,           FINDINGS AND RECOMMENDATION
                                            REGARDING PETITIO N FOR WRIT OF
11        v.                                HABEAS CORPUS

12                                          [Doc. 1]
    MIKE McDONALD,
13
                      Respondent.
14  _____/

15

16        Petitioner is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. §

17  2254.  Petitioner is represented by Charles French Carbone, Esq.

                            RELEVANT HISTORY
18
          Following a jury trial in the Merced County Superior Court, Petitioner was convicted of
19
    (1) murder with the special circumstance of robbery (Ca. Pen. Code, §§ 187, subd. (a), 190.2,
20
    subd. (a)(17)(a) (count one)[1]; (2) two counts of attempted robbery (§§ 211, 664) (counts two and
21
    four); and (3) robbery (count three).  The jury did not reach a decision on whether a firearm was
22
    used in each count.  (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)).
23
          Petitioner was sentenced to a determinate term of six years and four months, comprised of
24
    the five year upper term for the count 3 robbery and eight months for each of the count 2 and 4
25
    attempted robberies, followed by a consecutive term of life without the possibility of parole for
26
    murder.
27

28  _____
          [1] All further statutory references are the California Penal Code unless otherwise indicated.

                                            1

Petitioner filed a timely notice of appeal.  On January 7, 2010, the California Court of Appeal, Fifth Appellate District modified the judgment by staying the sentence on count two, but otherwise affirmed the judgment.

Petitioner filed a petition for review.  The California Supreme Court denied the petition on March 18, 2010.

Petitioner filed the instant petition for writ of habeas corpus June 13, 2011.  Respondent filed an answer to the petition on August 24, 2011, and Petitioner filed a traverse on September 6, 2011.

STATEMENT OF FACTS[2]

In the early morning hours of April 15, 2006, brothers Jose Miranda (Jose) and Antonio Miranda Solorio (Antonio), and their friend, Javier Mendoza, were driving from a dance club to a house belonging to Antonio's aunt and uncle located in Merced County, where the three had been staying.  Mendoza drove the car, while Jose was in the front passenger seat and Antonio in the back seat.  On the way, Mendoza noticed another car following them.  When they arrived at the house, the car behind them sped up; after Mendoza parked in the driveway, the other car stopped behind them "real fast."  Antonio saw three men run toward their car.  One man, who was carrying a small rifle, ran to the driver's side door and pointed the rifle at Mendoza, demanding money.  Mendoza got out of the car and handed the money in his wallet to the man, which the man put in his pocket.  Antonio tried to hide in the back seat by slumping down a few inches.  At some point, the rifle hit the window or door where Antonio was sitting, but the man did not say anything or gesture to Antonio.

Antonio saw two figures in the dark on the car's passenger side.  They pulled on Jose and said, "money."  Jose said, "no money."  Antonio saw the man with the rifle through the driver's side window at Jose, who was still in the car.  The other two pulled Jose from the car on the passenger side.  Antonio saw the man with the rifle run around the back of the car to the passenger side and heard another two to three shots.  He could not tell if the other men had guns.  Antonio saw the men run to their car, which looked like a Mustang with its top down, and drive off.  Antonio got out of the car on the driver's side and ran to his brother, who was lying on the front porch.  Antonio could tell the man with the rifle was African-American and he believed the other men were African-American because their voices "sounded black."  Antonio, however, could not identify any of the men.

A Merced deputy sheriff was dispatched to the scene shortly before 2:00 a.m.  On arrival, the deputy found a man down on the front porch who was not breathing.  Paramedics arrived shortly thereafter but efforts to revive the man, identified as Jose, failed.  The deputy questioned the visibly upset, Spanish-speaking men present at the scene through an interpreter.  The men told her they

---

[2] This statement of facts is taken from the January 7, 2010, opinion by the California Court of Appeal, Fifth Appellate District.  (Ex. A, to Answer.)

had been robbed by three black adult males and described the car carrying the robbers as a two-door Mustang.

The pathologist who conducted Jose's autopsy found two gunshot wounds. One bullet entered his left shoulder, shattered the bone, and exited through the posterior.  It was possible Jose was seated when he was shot.  The size of the entry wound was consistent with a small caliber weapon like a .22.  Another bullet entered through Jose's right shoulder and passed through his right lung and the aorta, triggering extensive and fatal bleeding.  The pathologist recovered that bullet from the body, which appeared to be a small caliber bullet consistent with a .22.  The pathologist opined the cause of death was bleeding due to the gunshot wound that severed the aorta.

Fernando Barrera's sister is marred to Brown.  At the time of the crime, Barrera, who owned a 1998 Ford Mustang convertible, was staying with his sister and Brown at their apartment.  Marcus Whitaker, who Barrera knew as "Feddy," also was staying at the apartment.  On the night of the crime, Whitaker was driving Barrera's car with Barrera in the front passenger seat and Brown in the back seat.  According to Barrera, another African-American male, who Barrera did not know, also was sitting in the back seat.  As the men were trying to get the attention of some girls who were in another car, a third car cut them off.  Whitaker began following that car.  When the car turned into a private home driveway, they pulled in right behind it.

Barrera saw Whitaker go up to the driver's side of the victims' car and the driver get on the ground.  Barrera also saw Brown and the unidentified man get out of the Mustang; Brown was struggling with the passenger on the passenger side of the victims' car and Brown's hands went into the car like he was hitting the passenger.   The unidentified man was standing behind Brown.  Barrera explained "Marcus Whitaker let a round off from the driver's side and hit the passenger and the passenger got out and I hear him yell, "'ay guey[,]'" which Barrera said would be translated as "oh shit" or "oh fuck."  Barrera then got out of the car and yelled, "What the fuck."  Whitaker told Barrera to get back in the car and he did so.  Brown was backing up towards the trunk of the victims' car as the passenger was walking toward Brown when Whitaker "came around and just started letting rounds off."  Barrera claimed that Brown and the unidentified man did not have guns.  As Brown was heard struggling with the passenger just before Whitaker fired the first shot, Barrera heard Brown say to Whitaker "get him Nigger."  Barrera and his three companions got into the Mustang and drove off, dropping the unidentified man at a convenience store.  The remaining three then returned to Brown's apartment.  Whitaker told Barrera not to say anything about the shooting.  Barrera saw Brown and Whitaker splitting up the robbery money at the apartment.

Barrera did not know what was going to happen when he went to the scene with the others and denied participating in the robbery in any way.  Barrera did not know why he did not call the police.  He was afraid of his companions after what had happened.  Barrera admitted that when he was first arrested, he told officers he did not know about the robbery and shooting, and he was not there.  But after a third interview he started to tell the truth, revealing Brown's participation in the incident.  Barrera said he decided to disclose what he had seen after talking to family members and people from his church, and because he felt guilty about what happened.

3

On cross-examination Barrera admitted initially lying to detectives about his presence at the murder scene and said he did so because he was afraid of Whitaker and concerned he or his family might be harmed. According to Barrera, there was no plan to commit a robbery and the robbery came as a shock and surprise to him. He acknowledged he was placed in a witness protection program or protective custody afer he told authorities the truth. He was subpoenaed to testify in Whitaker's case. Barrera said the only "deal" he had with the prosecution was to tell the truth. Barrera also acknowledged he was arrested in November 2007 for being drunk and disorderly, and in May 2008 for being drunk and disorderly and resisting arrest. He conceded those charges may have been dismissed.

After Barrera's arrest, deputies seized Barrera's Mustang. An expended CCI brand .22-caliber shell casing was found behind the back seat. Four Federal brand .22 caliber shell casings were found at the crime scene around the victim's car. No .22-caliber weapons were ever recovered. During a search of Brown's apartment pursuant to a warrant, three CCI brand .22-caliber bullets were found in a window sill. A Department of Justice criminalist analyzed the five .22 caliber shell casings and opined they were "most likely" fired by the same weapon, although he could not be absolutely certain of that. The criminalist was never provided a weapon with which to compare the casings.

Former Merced Sheriff's Department detective Tim McCann interviewed Brown on April 21, 2006, after returning him to Merced from the Oakland jail. The videotape of the interview was played for the jury. In that interview, Brown denied knowing much about Whitaker, who "had a lot of secrets." Brown admitted being involved in an attempted robbery. Brown initially claimed that on the night of the murder he and his wife had gone out drinking with Barrera and Whitaker's girlfriend, and then returned home and went to sleep.

After detectives told Brown they had evidence he was involved in Jose's murder, Brown admitted he was with Whitaker, Barrera and an unidentified male that night. They were in Barrera's Mustang, with Whitaker driving, Barrera in the front passenger seat and Brown and the unidentified man in the back seat. When the Mustang stopped behind the victims' car, Brown and his companions all got out of the Mustang and tried to rob the guys in the car. Brown approached Jose on the passenger side and pointed a broken revolver at his head. Brown demanded money, stating "give it up." Jose grabbed the revolver, took it away from Brown and pointed it at him. Brown, who knew the gun could fire at least once before jamming, said to Whitaker "get this fool. Get him." Later in the interview, he claimed he said he called to his fellow robbers to "shoot" Jose, saying "get him off of me somebody. Get him. Shoot him or something." Brown fled behind the victim's car and back to the Mustang; only then did he hear a shot. Brown denied knowing who shot Jose. Brown did not know how many shots he heard. Brown was told Barrera also had a gun, but it also did not work properly. Brown said Whitaker was carrying a saw-ed off, small caliber rifle. At one point in the interview, Brown said he knew Whitaker had fired a shot, but he thought the shot was aimed at the sky. Brown admitted being involved in other robberies or robbery attempts with Whitaker and Barrera. Brown admitted his job was to go up to the car and take the guy's money, but he didn't get the job done.

McCann interviewed Brown a second time 12 hours after the first interview. Brown refused to reveal the name of the fourth man in the vehicle. Brown again stated he had a revolver with him during the robbery which was

4

broken and held only one round, and that Jose had taken the gun from him and pointed it at him.  Brown also claimed that all four suspects carried guns, including Barrera.

Defense Case

Brown's mother, Sonya Brown, said Barrera called her Oakland home a couple of times on April 20, 2006 and asked to speak with Brown.  She did not know how long the two talked.  At the time of the calls, her son and his wife had been staying with her for several days.

Brown's wife, Lastar Brown, is Barrera's sister.  She said that on the night of the murder, Brown was with her at their Merced apartment the entire night.  Barrera was also at the apartment that night.  She did not know whether Brown left after she went to sleep that night and admitted he could have done so, but she probably would have heard him.  On April 16, 2006, which was Easter Sunday, Lastar and Brown left the apartment and went to her mother's.  They did not return to the apartment instead drove to Oakland, where they stayed for a couple of days.

(Ex. A to Answer, at 2-7.)

## DISCUSSION

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Merced County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

5

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.      Standard of Review

         Where a petitioner files his federal habeas petition after the effective date of the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d)

unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly

established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct.

770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412

(2000). Habeas relief is also available if the state court's decision "involved an unreasonable

application" of clearly established federal law, or "was based on an unreasonable determination

of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C.

§ 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to

the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant

state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule

may not be inferred from Supreme Court precedent, merely because such rule might be logical

given that precedent. Rather, the Supreme Court case itself must have "squarely" established that

specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct.

1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule

to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct.

733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state

court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398

(2011). "A state court's determination that a claim lacks merits precludes federal habeas relief so

long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Richter, 131 S.Ct. at 784.

III.    Instructional Error

Petitioner's sole claim for relief is the trial court improperly instructed the jury that they could find Petitioner vicariously liable for murder based on membership in a conspiracy to commit robbery or attempted robbery, resulting in a due process violation.

The California Court of Appeal, Fifth Appellate District denied this claim in the last reasoned decision.  (Lod. Doc. 1.)

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action.  See, Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See, id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  See, United States v. Frady, 456 U.S. 152, 169 (1982)

(*citing* Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined

that the instruction violated the petitioner's right to due process, a petitioner can only obtain

relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710

(1993) (whether the error had a substantial and injurious effect or influence in determining the

jury's verdict.).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

attack on the constitutional validity of a state court's judgment is even greater than the showing

required to establish plain error on direct appeal."  Id.

In denying the claim, the California Court of Appeal held as follows:

> The prosecution presented two possible theories of liability for murder:
> aiding and abetting and conspiracy to commit robbery or attempted robbery.  The
> jury was instructed that Brown was charged with murder under a theory of felony
> murder, and to prove his guilt of first degree murder, the People must prove, inter
> alia, Brown "aided and abetted, or was a member of a conspiracy to commit
> robbery or attempted robbery; ...."  The jury also was instructed that Brown could
> be convicted of the robbery or attempted robbery counts based on either aiding
> and abetting or conspiracy.

> Brown contends the trial court erred in instructing the jury that criminal
> liability could be based on a theory of conspiracy.  He asserts that conspiracy is a
> crime, not a theory of criminal liability, therefore an uncharged conspiracy cannot
> provide the basis for finding him guilty of robbery or attempted robbery and then
> of first degree murder using the felony murder rule.  He notes that section 31
> limits principals to persons who "directly commit the act constituting the offense,
> or aid and abet in its commission. . . ."  He observes that a person can engage in a
> conspiracy without aiding and abetting the commission of another crime and
> without attempting to commit another crime, and asserts that no case has held that
> an uncharged conspiracy may serve as the only basis of liability for a separate
> offense.  (See *People v. Belmontes* (1988) 45 Cal.3d 744, 788-789, disapproved
> on other grounds in *People v. Do[ol]in* (2009) 45 Cal.4th 390, 421, fn. 22);
> *People v. Durham* (1969) 70 Cal.2d 171, 185.)[n2]

> [n2] The People contend this contention is forfeited because Brown did not raise at
> trial the claim he raises on appeal, namely that an uncharged conspiracy is not a
> valid theory of liability.  As Brown asserts, his claim is reviewable on appeal
> without objection.  (§ 1259.)  Accordingly, we address his claim.

> The contention is academic because the evidence in the present case
> showed that Brown either directly committed or aided and abetted the others in
> committing the robbery or attempted robberies upon which the felony murder
> charge was based.  Thus, we need not decide whether an uncharged conspiracy
> may serve as the basis of a defendant's liability for another crime, where the facts
> constituting the defendant's participation in the uncharged conspiracy do not

constitute aiding and abetting in the commission of the other crime.

As Brown observes, a person who either directly commits a crime or aids and abets another in committing a crime is a principal in the commission of that crime. (§ 31.) "A person aids and abets the commission of a crime when he or she, (I) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164; *People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Here, the evidence showed that at least Brown and Whitaker approached the victims' car and with each others' active assistance, robbed or attempted to rob him. While, as Brown points out, the prosecutor argued conspiracy to commit robbery as a separate theory of liability for felony murder, the facts the prosecutor relied on in making that argument are the same facts he relied upon when arguing Brown aided and abetted the commission of the robbery and attempted robberies, namely that Brown and the others acted together in attempting to rob the victims.

Thus we reject Brown's contention, because it is inapposite to the facts of the present case.

(Lod. Doc. 1 at 7-9.)

Federal habeas relief is not available for errors of state law only. 28 U.S.C. § 2254(a); see also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Errors in state jury instructions are generally a matter of state law and thus do not usually invoke a constitutional question. Gilmore v. Taylor, 508 U.S. 333, 342-343 (1993). "Claims that merely challenge the correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights." Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986); see also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief.").

As just stated, the California Court of Appeal found as a matter of state law that it "need not decide whether an uncharged conspiracy may serve as the basis of a defendant's liability for another crime, where the facts constituting the defendant's participation of the uncharged conspiracy do not constitute aiding and abetting in the commission of the other crime." (Lod. Doc. 1, at 8.) Petitioner argues at length that California Penal Code section 31 limits liability to

9

principals who directly commit the act constituting the offense, or aid and abet in its commission, Under section 31, "[a] person aids and abets the commission of a crime when he or she, (I) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (Lod. Doc. 1, at 8, citing People v. Cooper, 53 Cal.3d 1158, 1164 (1991) and People v. Beeman, 35 Cal.3d 547, 561 (1984).)

The appellate court determined that the jury found beyond a reasonable doubt that Petitioner aided and abetted the commission of the robbery and attempted robberies by acting with the others together in attempting to rob the victims.  This finding is supported by the record. In an interview with detectives, Petitioner admitted he held a gun to the head of Jose Miranda and demanded money before Miranda supposedly wrested Petitioner's gun from him, which caused Petitioner to tell his cohorts to "get" Jose, by shooting him.  (CT 414-417, 427, 429-430, 432, 434, 452.)  In addition, Barrera testified as to Petitioner's active participation in the robbery and attempted robbery and Petitioner told his cohorts to shoot Jose Miranda.  (RT 210.) Therefore, even though the prosecutor argued conspiracy to commit robbery as a separate theory of liability for felony murder, any error was harmless in light of the facts presented to the jury. Furthermore, to the extent Petitioner contends the state court erred in interpreting its own law, such an error does not give rise to a cognizable ground on federal habeas corpus.  McGuire, 502 U.S. at 68 n.2.

Based on the foregoing, the Court finds the California court's rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 19, 2011**                     **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE